# UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF LOUISIANA
# ALEXANDRIA DIVISION

JOHN FITZGERALD HANSON,

    *Plaintiff,*

v.

GENTNER DRUMMOND, et al.,

    *Defendants.*

No. 1:25-CV-00102-DDD-JPM

**ATTORNEY GENERAL GENTNER DRUMMOND'S RESPONSE TO PLAINTIFF'S MOTION FOR EMERGENCY RELIEF AND OBJECTION TO THE MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**

    Defendant Gentner Drummond, the Attorney General of Oklahoma, agrees with the Federal Defendants, Doc. 8, that Plaintiff's claims are entirely without merit and that there is no legal basis for this Court to adopt the Magistrate Judge's Report and Recommendation ("Recommendation"), Doc. 5. The Attorney General submits this supplement in support of the Federal Defendants' response, with three basic arguments.[1] *First*, further delay of Plaintiff's transfer in this matter harms the victim's family and public. *Second*, several procedural aspects of this case are problematic, to say the least. *Third*, Plaintiff failed to disclose that he has already—and unsuccessfully—raised his *McGirt* claims in a petition for post-conviction relief. Accordingly, Attorney General Drummond urges this Court to decline to adopt the Recommendation and reject the motion for injunctive relief.

## BACKGROUND

    Over a quarter century ago, on August 31, 1999, Plaintiff embarked on a violent rampage, a crime spree that culminated in his kidnapping and mercilessly executing 77-year-old Mary Bowles ("Mary"). Doc. 1, ¶ 9; Doc. 1-1 at 1. Moments before this murder, his accomplice shot and killed

---

[1] The Attorney General reserves the right to raise any other defenses in Rule 12(b) or elsewhere.

Jerald Thurman. Doc. 1-1 at 1. A jury convicted Plaintiff of Mary's murder and recommended the death penalty. After the Oklahoma Court of Criminal Appeals ("OCCA") remanded the case for resentencing, a second jury also recommended death. Doc. 1, ¶ 10. The OCCA affirmed. *Id.*

Plaintiff has exhausted all state and federal appeals of his convictions and sentence. *Id.* ¶¶ 10–11. Plaintiff also lost a separate Eighth Amendment challenge to Oklahoma's execution protocol in federal court. *Id.* ¶ 12. Lastly, and most significant here, Plaintiff unsuccessfully challenged Oklahoma's jurisdiction to prosecute him based on *McGirt v. Oklahoma*, 591 U.S. 894 (2020), in a successive petition for post-conviction relief. *See* Opinion Denying Successive Application for Capital Post-Conviction Relief at 1, *Hanson v. Oklahoma*, No. PCD-2020-611 (Okla. Crim. App. Sep. 9, 2021).

Although the OCCA ordered Plaintiff's execution to be carried out on December 15, 2022, Doc. 1, ¶ 13, the court's lawful order was thwarted by the Biden Administration's refusal to conduct the transfer process outlined in 18 U.S.C. § 3623. Doc. 1, ¶¶ 29–44. Despite the death penalty being enshrined in both federal and state law, the Biden Administration argued that Plaintiff's transfer "to state authorities for state execution is not in the public interest." Doc. 1-1 at 9. Oklahoma then sued the United States in federal court, arguing that this decision was *ultra vires*; the court dismissed the claim without addressing the merits, however, holding that it lacked jurisdiction. *See Oklahoma v. Tellez*, No. 7:22-CV-00108-O, 2022 WL 17686579 (N.D. Tex. Dec. 13, 2022).

On January 20, 2025, President Trump issued an executive order declaring that it is a policy of the United States "to counteract the politicians and judges who subvert the law by obstructing and preventing the execution of capital sentences." Doc. 1-1 at 2. Soon after, on January 23, Attorney General Drummond wrote to the Bureau of Prisons ("BOP") requesting the transfer of Plaintiff in advance of March 20, 2025, so that he would be eligible for the next execution date (likely in mid-June). Doc. 8-1. On February 5, 2025, United States Attorney General Pam Bondi issued a memorandum titled "Reviving the Federal Death Penalty and Lifting the Moratorium on Federal

2

Executions." Doc. 8-4. In order to "[a]ssist[] with the Implementation of State and Local Death Sentences," Attorney General Bondi directed:

> [T]he Federal Bureau of Prisons . . . to work with each state that allows capital punishment to ensure the states have sufficient supplies and resources to impose the death penalty. **This includes transferring federal inmates with state or local death sentences to the appropriate authorities to carry out those sentences**.

*Id.* at 4 (emphasis added). Finally, on February 11, 2025, Attorney General Bondi issued a memorandum to the Acting Director of the BOP directing the transfer of Plaintiff to Oklahoma authorities. *See* Doc. 8-2. Attorney General Bondi wrote: "The Department of Justice owes it to the victim and her family—as well as to the public—to transfer inmate Hanson so that Oklahoma can carry out this just sentence." Doc. 8-2 at 2.

On January 29, 2025, Plaintiff filed his unverified compliant and motion for emergency injunctive relief here seeking—twenty-six years after he murdered Mary—to delay justice yet again with so-called "causes of action" that entirely lack merit. Although Plaintiff's counsel represents to this Court that she is officed in a building that is approximately two miles from the Oklahoma Attorney General's primary headquarters, Doc. 1, she did not promptly notify the Attorney General of the lawsuit or even proffer any efforts made to provide immediate notice of this action. The only mention of notice in Plaintiff's motion "certifies" that "copies *were* mailed to Defendants or their representatives." Doc. 3 at 2 (emphasis added). Yet, these alleged copies were never apparently sent. Rather, on February 3—five days after the lawsuit was filed—a paralegal emailed "courtesy copies" of the lawsuit's documents to the Attorney General's Office, including the Magistrate Judge's already issued Recommendation. *See* Exhibit 1. The paralegal added that "Formal service w/ summons will follow." *Id.* Finally, eight days after the lawsuit was filed, and six days after the Recommendation issued, counsel for Plaintiff requested summons for Attorney General Drummond, which was then hand-delivered to his headquarters in Oklahoma City the same day.

3

**ARGUMENTS**

I.   **Timely justice for victims, their families, and the community is in the public interest and any injunctive relief would have an intensely adverse effect on that interest here.**

Mary Bowles "was the daughter of proud Oklahoma homesteaders." Exhibit 2, Declaration of Sara Parker Mooney, ¶ 3. A lifelong resident of Tulsa, Oklahoma, Mary worked as a senior vice president at a bank before she retired. *Id.*; *see also Missing For A Week: Retired BOK Senior Vice President Found Dead*, NEWS ON 6 (Sept. 8, 1999).[2] Mary was an active and passionate volunteer—a "valuable member of the community." Ex. 2, Mooney Decl., ¶ 3. Among other things, she "worked tirelessly in her church for decades," and she volunteered at Saint Francis hospital in Tulsa, at the Tulsa Philharmonic, and at the Speech and Hearing Clinic. *Missing*, NEWS ON 6, *supra*. Her friends considered her a "wonderful person," *id.*, and she was a "role model for professional women." Ex. 2, Mooney Decl., ¶ 3. She was also the beloved matriarch of her family. *Id.* Mary "was like a surrogate mother" to her niece Sara Parker Mooney, who has submitted her testimony here on behalf of Mary's family, and she "was very involved in the lives of" numerous other family members. *Id.* ¶ 4.

All that ended horrifically in 1999, when Plaintiff kidnapped a 77-year-old Mary from the Promenade Mall in Tulsa, drove her to an isolated dirt pit near Owasso, Oklahoma, forced her into a ditch, and "shot her multiple times with his 9 mm semiautomatic pistol." *Hanson v. State*, 2009 OK CR 13, ¶ 2, 206 P.3d 1020, 1025; *see also Hanson v. Sherrod*, 797 F.3d 810, 820 (10th Cir. 2015) ("The state's forensic pathologist testified that [Mary] suffered 'without a doubt four and, likely, six' gunshot wounds."). Plaintiff then left Mary's body to rot, such that when it was found later it was extremely difficult to identify; indeed, the situation was so bad that the police advised the family not to view Mary's remains. Ex. 2, Mooney Decl., ¶ 6; *see also Hanson*, 797 F.3d at 820 (describing Mary's body as "significantly decomposed").

---

[2] *Available at* https://www.newson6.com/story/5e3686572f69d76f6209bfe4/missing-for-a-week:-retired-bok-senior-vice-president-found-dead.

With that heinous act, Plaintiff irreparably devastated the lives of many. "Mary's murder was terrible for [her] family," and particularly her younger sister, Ora Lee Bowles Parker, who was Mary's only surviving sibling when the murder occurred. Ex. 2, Mooney Decl., ¶¶ 2, 5. In the moment, Mary's family spent several agonizing days searching for her, not knowing that she had been brutally murdered. *Id.* ¶ 5. Then, when she was found, the family had to confront the reality that they could not even view the body. Ora Lee "did not deal well with that. That part was very difficult for her." *Id.* ¶ 6. Indeed, the murder "changed the balance of" Ora Lee's "life, to her detriment. She was never the same, afterward." *Id.* Overall, "Mary's murder was indescribably difficult then, and it still is now" for her family. *Id.* ¶ 8. The family has "been worn out by the multiple trials, re-trials, and appeals" over the course of twenty-six years, as they wait for justice to finally be served for Mary. *Id.*

\* \* \*

Far too often in cases involving capital punishment, the focus is on the killers rather than the victims and their families. Effectively demonstrating this point, Mary is not mentioned a single time in Plaintiff's complaint or his emergency motion—nor is she named in the Recommendation. This is wrong. The continued harm that families like Mary's experience every time a justly bestowed sentence is delayed is beyond immense and cannot be ignored.[3] The Supreme Court has declared that "[p]rotecting against abusive delay *is* an interest of justice." *Martel v. Clair*, 565 U.S. 648, 662 (2012). Indeed, "[b]oth the State and the victims of crime have an important interest in the timely enforcement

---

[3] Here, Jerald Thurman and his family should not be forgotten, either. Although Plaintiff's state sentence is not for Thurman's murder, Plaintiff's accomplice gunned Thurman down in cold blood when Thurman became a potential witness to Mary's abduction. Thurman "always made people laugh," and he dreamed with his wife "about expanding their Owasso trucking and excavating company that employs several family members." *Murder Victim's Family Trying To Cope With Loss*, NEWS ON 6 (Sept. 23, 1999), *available at* https://www.newson6.com/story/5e3686502f69d76f6209bf53 /murder-victims-family-trying-to-cope-with-loss. Among other things, Thurman's murder forced his son to drop out of college to run the family business. *Son Of Man Murdered 13 Years Ago Still Awaiting Closure*, NEWS ON 6 (Sept. 14, 2012), *available at* https://www.newson6.com/ story/5e36483d2f69d76f62061f64/son-of-man-murdered-13-years-ago-still-awaiting-closure.

5

of a sentence." *Bucklew v. Precythe*, 587 U.S. 119, 149 (2019) (citation omitted); *see also United States v. Vialva*, 976 F.3d 458, 462 (5th Cir. 2020) (per curiam) ("timely enforcement of [a] death sentence" is in "the public's interest").

Recognizing this, in response to Attorney General Drummond's request to end the decades-long delay in carrying out Plaintiff's sentence, Attorney General Bondi declared that following BOP's internal policy guidance—which states the "public interest is typically not served by transferring an inmate to state custody before a federal sentence is fully served," Doc. 8-2 at 2—would "grossly undermine[] the public interest" in circumstances "where a state is ready to carry out a lawful death sentence." *Id.* This policy applies to Plaintiff's case specifically because Mary "experienced indescribable pain and terror before her violent death, and her family has suffered for decades as a result." *Id.* Therefore, "[t]imely enforcement of inmate Hanson's death sentence will achieve justice and provide a measure of closure to the victim's family and her community for the horrific crime committed by inmate Hanson." *Id.* at 3. This is undeniably correct. *See, e.g.*, Ex. 2, Mooney Decl.

It also dovetails with state law. Oklahoma's Constitution enshrines victims' rights. OKLA. CONST. art. 2, § 34. Those rights "shall be protected by law in a manner no less vigorous than the rights afforded to the accused." *Id.* §34(A). Importantly here, Mary's family has a right "to proceedings free from unreasonable delay and a prompt conclusion of the case." *Id.* As "the chief law officer of the state," OKLA. STAT. tit. 74, § 18, Attorney General Drummond must defend and uphold those rights. He has a strong interest in doing so, as evidenced by his and his predecessor's years'-long battle with the federal government to effectuate Plaintiff's transfer to Oklahoma custody. Plaintiff's interest in avoiding his transfer to the state, an interest for which he has provided no legal justification, certainly does not outweigh the right of the victims and the public in Oklahoma for justice.

Mary's family has suffered through an excruciatingly long delay and onslaught of litigation that has stretched the promise of justice to its breaking point. "It has been over 25 years of drama," and

the family is "ready to be done with this matter." Ex. 2, Mooney Decl., ¶ 8. They are understandably "disappointed and angry with the machinations of the judicial system and the political aspects of the last years." *Id.* Once this matter comes to an end, everyone will be able to "move forward." *Id.* ¶ 9. Mary's family—along with the public and the State—has a right to see this case come to an end, a right that is certainly not outweighed by Plaintiff's frivolous objection to his transfer. This Court should deny the motion. It is Mary's family who deserves relief here, not her murderer.

**II.     Several procedural aspects of this case are troubling.**

"A condemned man's life and society's interest in enforcing the death penalty justly are matters too important to leave to procedural games." *Bell v. Lynaugh*, 858 F.2d 978, 986 (5th Cir. 1988) (Jones, J., specially concurring). As detailed above, this lawsuit was filed, and a judicial recommendation for a TRO entered, before Attorney General Drummond was notified of the case's existence, much less properly served. And Plaintiff's counsel has provided no explanation—nor is one apparent—for why service could not have been rendered immediately, given that said counsel's office is nearly within walking distance of the Oklahoma Attorney General's Office.

As for the Recommendation, as noted in Federal Defendants' motion and objection, Doc. 8 at 4, the Magistrate Judge likely went beyond the scope of 28 U.S.C. § 636(b)(1)(A) in recommending injunctive relief. The language of that subsection authorizes "a judge [to] designate a magistrate judge to hear and determine any pretrial matter pending before the court, *except a motion for injunctive relief*." *Id.* (emphasis added). To be sure, the following subsection authorizes judges to "designate a magistrate judge to conduct hearings . . . and to submit to a judge of the court proposed findings of fact and recommendations for the disposition, by a judge of the court, of any motion excepted in subparagraph (A)." *Id.* § 636(b)(1)(B); *see also, e.g.*, *Assocs. Fin. Servs. Co. v. Mercantile Mortg. Co.*, 727 F. Supp. 371, 375 (N.D. Ill. 1989) ("A magistrate cannot determine a motion for injunctive relief but he may conduct a hearing on that motion and issue a report and recommendation . . . ."). But no hearing of any kind

7

was conducted here; indeed, it is axiomatic that Attorney General Drummond was not even notified before the *ex parte* Recommendation issued.

Rule 65(b) carries strict requirements that the Recommendation did not discuss, and Plaintiff failed to meet. The Supreme Court has emphasized the "stringent restrictions" imposed by Rule 65(b) on the issuance of *ex parte* TROs, restrictions that "reflect the fact that our entire jurisprudence runs counter to the notion of court action taken before reasonable notice and an opportunity to be heard has been granted both sides of a dispute." *Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers Loc. No. 70 of Alameda Cnty.*, 415 U.S. 423, 438–39 (1974).

Specifically, an *ex parte* TRO may issue only if:

(A) specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition; and

(B) the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required.

Fed. R. Civ. P. 65(b)(1)(A–B). A plaintiff must meet all these stringent requirements. *See, e.g.*, *Harris v. City of Alexandria Hous. Auth.*, No. 1:21-CV-03182, 2021 WL 11085936, at *1 (W.D. La. Sept. 1, 2021). But here, Plaintiff did not even come close to meriting an *ex parte* recommendation for a TRO.

First, Plaintiff filed an unverified complaint, did not provide an affidavit to establish his justifications for a TRO, and did not certify any efforts to give notice. These failures prevent him from overcoming the baseline stringent restrictions imposed by Rule 65(b), and the Recommendation is thus devoid of findings regarding those mandatory prerequisites.[4]

Second, Plaintiff's claims of injury and the findings in the Recommendation do not "clearly show that immediate and irreparable injury, loss, or damage will result." Fed. R. Civ. P. 65(b)(1)(A).

---

[4] Attorney General Drummond, however, submits a sworn statement of a member of the victim's family, establishing that any further delay to this decades-long march towards justice is distinctly not in the public interest. *See* Ex. 2, Mooney Decl.

8

For one, the findings are admittedly based on assumption, in part. *See* Doc. 5 at 5. Additionally, the only finding of harm was based on Plaintiff's execution, but that execution is not currently scheduled and could occur *at the earliest* over four months from now. *See* Doc. 5 at 4 n.5. This is hardly an emergency deserving *ex parte* action of any kind. Nor has Plaintiff shown that a lawful execution can somehow constitute irreparable harm for purposes of a simple transfer from federal to state custody. Execution is the ultimate punishment, to be sure, but Plaintiff has fully earned that remedy by killing Mary in cold blood. "[I]n the eyes of the law, petitioner does not come before the Court as one who is 'innocent', but, on the contrary, as one who has been convicted by due process of law of [a] brutal murder[]." *Herrera v. Collins*, 506 U.S. 390, 399–400 (1993).

Granted, the Magistrate Judge correctly acknowledged in passing that there can be no actual temporary restraining order until this Court orders such injunctive relief. *See* Doc. 5 at 6 n.7 (citing *NRT Tex. LLC v. Wilbur*, No. 4:22-CV-02847, 2022 WL 18456949, at *1 (S.D. Tex. Sept. 14, 2022)). But the mere issuance of the Recommendation in these *ex parte* circumstances was inappropriate, in part because parties are not inclined to ignore a judge's instructions, even if it is just a recommendation. Indeed, in *Wilbur* itself—which, again, the Magistrate Judge cited—the court warned that a party would defy a recommended TRO at its "own peril." *Wilbur*, 2022 WL 18456949, at *1. Thus, although the Magistrate Judge issued only a "recommendation," its ruling effectively operates as an *ex parte* TRO. And an *ex parte* TRO is supposed to expire "at the time after entry—not to exceed 14 days— that the court sets." FRCP 65(b)(2)). The Magistrate Judge's ruling, however, has no expiration.

For these reasons and those contained in the Federal Defendants' motion and objection, Doc. 8, Attorney General Drummond requests that this Court reject the Recommendation promptly.

### III.    Plaintiff failed to disclose his unsuccessful attempt to raise *McGirt* in state court.

Finally, Plaintiff's unverified complaint and motion are misleading because they failed to notify the Court of his previous failed attempt to challenge his conviction in state court based on principles

9

of *McGirt v. Oklahoma*. *See* Doc. 1, ¶¶ 21–25; Doc. 3 at 3–4. As noted in Federal Defendants' filing, Plaintiff unsuccessfully challenged Oklahoma's jurisdiction to prosecute and punish him based on his status as a tribal citizen and the location of his crimes. Doc. 8 at 8 n.3. There, in rejecting Plaintiff's successive application for capital post-conviction relief, the OCCA referred to its previous opinion, *State ex rel. Matloff v. Wallace*, 497 P.3d 686 (Okla. Crim. App. 2021), as being dispositive of Plaintiff's claim. *See* Opinion Denying Successive Application for Capital Post-Conviction Relief at 2–3, *Hanson v. State*, No. PCD-2020-611 (Okla. Crim. App. Sept. 9, 2021). In its summary opinion there, the OCCA held that Plaintiff was not entitled to post-conviction relief because his "state convictions were long final when *McGirt* was decided," *id.* at 2, and *Wallace* determined "that the new rule of criminal procedure concerning Indian Country jurisdiction announced in *McGirt* would not be applied retroactively to void a state conviction that was final," *id.* Accordingly, the OCCA denied Plaintiff's successive attempt to unsettle his "long final" state court convictions and sentences.

Federal Defendants are correct that "this action is not the appropriate forum in which to raise a challenge to his state conviction and sentence of death." Doc. 8 at 8. And even assuming that federal habeas relief is still an available avenue for him, the Eastern District of Oklahoma has recently denied a similar claim in a habeas petition. *See* Exhibit 3, Opinion and Order at 13–18, *Fitzer v. Hamilton*, No. CIV-18-283-RAW-GLJ (E.D. Okla. Jan. 2, 2025). Specifically, the court ruled that "[t]o the extent the OCCA's *Wallace*-based ruling on Petitioner's *McGirt* claim is considered to be the application of a procedural bar, this Court finds it was independent and adequate, and Petitioner has not shown cause and prejudice or a fundamental miscarriage of justice." *Id.* at 17. Thus, because Plaintiff has already unsuccessfully challenged Oklahoma's jurisdiction over this matter, and a similar federal habeas petition claim was unsuccessful, he is highly unlikely to succeed on the merits.

## CONCLUSION

This Court should deny Plaintiff's motion and reject the Recommendation.

Respectfully submitted,

| | |
|---|---|
| */s/ Garry M. Gaskins, II* | */s/ Zachary Faircloth* |
| *GARRY M. GASKINS, II, OBA NO. 20212<br>   *Solicitor General*<br>*Zach West, OBA No. 30768<br>   *Director of Special Litigation*<br>OFFICE OF ATTORNEY GENERAL<br>STATE OF OKLAHOMA<br>313 N.E. 21st Street<br>Oklahoma City, OK 73105<br>Phone: (405) 521-3921<br>Garry.Gaskins@oag.ok.gov<br>Zach.West@oag.ok.gov<br>*Counsel for Attorney General Drummond* | ZACHARY FAIRCLOTH (LA #39875)<br>   *Principal Deputy Solicitor General*<br>OFFICE OF THE LOUISIANA ATTORNEY GENERAL<br>1885 North Third Street<br>Baton Rouge, LA 70802<br>Phone: (225) 326-6705<br>Facsimile: (225) 326-6795<br>FairclothZ@ag.louisiana.gov<br>*Local Counsel for Attorney General Drummond* |

*Pro Hac Vice status pending[5]

---

[5] Mr. Gaskins' motion has been submitted. The Oklahoma Supreme Court has been closed on Monday, February 17 (President's Day), and Tuesday, February 18 (inclement weather). When that court reopens, Mr. West will obtain a certificate of good standing and submit his motion.

11

## **CERTIFICATE OF SERVICE**

      I hereby certify that on February 18, 2025, I electronically transmitted the foregoing document to the Clerk of the Court via the Court's CM/ECF system, which effects service upon all counsel of record.

| | |
|---|---|
| */s/ Garry M. Gaskins, II* | */s/ Zachary Faircloth* |
| GARRY M. GASKINS, II | ZACHARY FAIRCLOTH |